OPINION OF THE COURT
Edward Greenfield, J.
This CPLR article 78 proceeding raises the question of the extent to which bidders on public contracts are required to set aside part of their jobs for locally based enterprises, minority enterprises, and women-owned business enterprises since the United States Supreme Court struck down a race-conscious municipal set-aside program in 1989.
In this proceeding, Martin Associates, Inc. (Martin), an unsuccessful bidder, moves for an order: (1) annulling the award by respondent New York City Health and Hospitals Corporation (hereinafter HHC) of a public improvement contract to respondent Roy Kay, Inc. (Roy Kay) and further staying HHC from disbursing public funds in payment or furtherance of said contract; and (2) directing that the contract be awarded to Martin, on the grounds that the successful bidder had not complied with the mandated set-aside provisions for local and minority-owned business enterprises.
HHC is undertaking an approximately $200,000,000 modernization project (known as the Wicks Law Project) at the City Hospital Center located in Elmhurst, New York. In *60 furtherance thereof, HHC publicly advertised for sealed competitive bids on October 2, 1992 for a prime contract for the heating, ventilation, and air conditioning (HVAC) work. HHC opened the HVAC contract bids on December 22, 1992. The three lowest bidders were: (1) Roy Kay at $7,486,000; (2) Wenco Mechanical Corp. (Wenco) at $7,499,000; and (3) petitioner Martin at $7,741,000.
Immediately upon opening the bids, petitioner vigorously protested the bids submitted by both Roy Kay and Wenco as nonresponsive. Despite these protests, HHC awarded the HVAC contract to Roy Kay on March 3, 1993 as the lowest responsible and responsive bidder. On March 16, 1993 HHC sent Roy Kay a notice to proceed with the work; Roy Kay allegedly has taken substantial steps in preparation for commencement of the work.
Petitioner then commenced this action by order to show cause. Petitioner’s request for a temporary restraining order pending the court’s determination was denied. In its petition, Martin asserts that Roy Kay should not have been awarded the contract because its bid did not comport with HHC’s contractual requirements that mandated contractors utilize either: (1) locally based enterprises (LBEs); or (2) minority or women-owned business enterprises (MBEs and WBEs). Petitioner further asserts that Wenco, as the next apparent lowest bidder, also could not be awarded the contract because it did not even submit the required LBE, MBE, or WBE utilization form. Of the three lowest bidders, petitioner claims that it was the only one that properly included a plan for the utilization of qualified MBEs or WBEs as subcontractors on the project, and thus was the lowest responsible and responsive bidder to whom the HVAC contract should be awarded.
NEW YORK CITY ADMINISTRATIVE CODE — LOCALLY BASED ENTERPRISES
HHC is a public benefit corporation created pursuant to section 7381 of McKinney’s Unconsolidated Laws of New York. It is a nonmayoral agency independent of the City of New York and it is not per se a city agency (NY City Health and Hospitals Corporation Act § 4 [1] [L 1969, ch 1016, § 1]; Brennan v City of New York, 59 NY2d 791, 792). As such, HHC is not governed by the Administrative Code of the City of New York. Nevertheless, HHC may selectively decide to include the requirements of the Administrative Code in its *61 public improvement contracts. HHC did so provide in the instant case, specifically stating in the Agreement, article 22, that the contract is subject to Administrative Code § 343-8.1 (now recodified at § 6-108.1), which section pertains to awarding City contracts and subcontracts to "locally based enterprises”.*
The purpose of the LBE provisions are to ensure that small businesses conducting business in economic development areas or employing economically disadvantaged persons receive a greater share of the City’s construction contract dollars. In furtherance thereof, section 6-108.1 provides that:
"b. Each contracting agency shall * * * seek to ensure that not less than ten percent of the total dollar amount of all contracts awarded for construction projects during each fiscal year shall be awarded to locally based enterprises.
"c. Each contracting agency shall * * * include in every contract to which it becomes a party such terms and conditions * * * to provide that if any or all of the contract is subcontracted, not less than ten percent of the total dollar amount of the contract shall be awarded to locally based enterprises” (emphasis supplied).
The statute clearly does not require contractors to subcontract work merely to satisfy the 10% quota if such subcontracting is not necessary. The LBE requirement applies only if the contractor is going to subcontract work. (See, Rep of Comm on Economic Dev, 1984 NY City Legis Ann, at 41, to wit, "[i]f the contractor does the entire job by himself, he need not hire any LBEs.”)
The bid documents for the HHC contract do not require anything more than that required by the Administrative Code. Indeed, the relevant provisions in the bid documents mirror the language of section 6-108.1. Specifically, the contract book provides, at Information for Bidders, section 19 — Locally Based Enterprise Program, that:
"B. The Contractor shall indicate in his proposal whether he intends to subcontract any of his work.
"To be considered a responsive bidder the Contractor is *62 required to submit a completed signed statement on form B-l of the bid proposal. This is to indicate if work is to be subcontracted and what items will be given to LBEs in order to meet the 10% requirement.
"C. If any portion of the Contract is subcontracted, not less than ten percent (10%) of the total dollar amount of the contract shall be awarded to locally based enterprises ('LBEs’) * * *
"F. Within forty (40) consecutive calendar days after the award, the Contractor shall submit * * *:
"1. an 'LBE Participation Schedule’ (Form LBE A-l): * * *
* * *
"i. When the 'LBE Participation Schedule’ indicates that no work will be subcontracted, no work may be subcontracted without prior approval, which shall be granted only if the Contractor seeks LBE subcontractors to perform the work.”
Here, Roy Kay timely submitted the requisite LBE Form B-1 on December 22, 1992, indicating that it intended to do 100% of the work itself. Because Roy Kay did not intend to subcontract any portion of the work under the contract, it was not required to submit a plan for the participation of LBEs. Therefore, Martin’s arguments to the contrary are without merit.
Martin next argues, however, that it is legally impermissible for Roy Kay to perform all of the work itself since the contract involves electrical work which can only be performed by a licensed electrical company. Because Roy Kay is not a licensed electrical company qualified to perform electrical work in the City of New York (NY City Electrical Code [Administrative Code] § 27-3017), Martin argues that Roy Kay cannot therefore perform this contract without subcontracting out the electrical work.
Contrary to Martin’s arguments, the Electrical Code does not require that Roy Kay, the company, be licensed to do electrical work. Rather, the Electrical Code only mandates that the work be done by a person, partnership, or corporation holding a valid license to perform electrical work (NY City Electrical Code § 27-3017 [a]). In an affidavit submitted by the president of Roy Kay, he states that Roy Kay employs two licensed electricians who would perform the small amount of electrical work needed on this job. Roy Kay also submitted a copy of the license issued to one of these electricians. Accord *63 ingly, Martin’s arguments that HHC erred in awarding the contract to Roy Kay on this ground is without merit.
NEW YORK STATE PROGRAM FOR MINORITY AND WOMEN-OWNED ENTERPRISES
On July 19, 1988, New York State enacted a comprehensive program designed to increase the participation of minority and women-owned enterprises in contracts awarded by the State and its agencies (see generally, Executive Law art 15-A; §§ 310-318 [as added by L 1988, ch 261, § 63]). Effective July 25, 1990 HHC became subject to the provisions of article 15-A for purposes of awarding State contracts (NY City Health and Hospitals Corporation Act § 8 [6] [as added by L 1990, ch 883]).
Article 15-A established the Office of Minority and Women’s Business Development (OMWBD) and empowered the director of that agency to, inter alia, promulgate regulations in furtherance of the plan (Executive Law § 311 [1]; § 313 [1]). Article 15-A did not, however, specify a quota or percentage set-aside of work on State contracts for MBEs and WBEs. Rather, the statute employs such language as "participation requirements” (Executive Law § 313 [5]) or "fair share” (Executive Law § 313 [1]) to designate those portions of a State contract which are targeted for MBEs and WBEs.
The regulations promulgated pursuant to article 15-A, 9 NYCRR parts 540-544 (1992), require all State agencies to submit to the director of OMWBD "agency goal plans” which set the goal for the percentage of participation of MBEs and WBEs on contracts issued by the agency along with a justification for the goal (9 NYCRR 541.2 [a]). The contracting agencies must also establish a MBE or WBE participation goal for each individual contract (9 NYCRR 543.2).
Prime contractors selected as the low bidder must submit a "utilization plan” specifying the MBEs and WBEs which the contractor intends to employ as subcontractors, the amount of money to be paid to the MBEs/WBEs, and a description of the work that these subcontractors will perform (9 NYCRR 543.3). If the contractor is unable to meet the MBE/WBE participation requirements specified by the agency for the contract, the contractor must submit a request for a waiver (9 NYCRR 543.7 [a]). Partial or total waivers from the MBE/WBE participation requirements may be granted by the contracting agency only upon the submission by the contractor of a written request which documents the "good faith efforts” *64 made toward the achievement of the "goal requirements” (9 NYCRR 543.7 [a]).
In 1989, the Supreme Court in Richmond v Croson Co. (488 US 469) struck down, on Fourteenth Amendment equal protection grounds, a program instituted by the City of Richmond, Virginia, which reserved 30% of all public contracting work for minority-owned business enterprises. The Supreme Court determined that the City of Richmond had failed to present sufficient evidence of a compelling governmental interest necessary to support the enactment of such race-conscious legislation (supra, at 498-506). The Croson Court did not, however, completely foreclose the possibility of race-conscious remedial relief (supra, at 509). Nevertheless, red flags of doubt were raised concerning the constitutionality of State set-aside programs like that adopted by New York.
As a result of the Croson decision (supra), the director of OMWBD promulgated a temporary emergency amendment to the regulations issued under article 15-A, which added a new section 543.2-A to the regulations, effective December 19, 1990 (see, NY Reg, Jan. 9, 1991, at 20-21). The final rule adopted on April 10, 1991, and renumbered section 543.2 (c), provides that any requirement to make good-faith efforts to meet disadvantaged enterprise participation goals on State-funded contracts will not be enforced until the agency determines that a firm basis in fact exists for believing that (a) as to minority enterprises, a compelling State interest supports the participation goals; and (b) as to women-owned enterprises, a constitutionally sufficient State interest supports the goals. Thus, the amendment had the effect of suspending indefinitely enforcement of the requirement that contractors make good-faith efforts to comply with the disadvantaged enterprise goals on State-funded contracts.
New York State undertook an exhaustive study to determine whether article 15-A and the regulations were justified in light of the Croson decision (supra). On September 9, 1992, OMWBD published its findings determining that: "based upon factual evidence * * * it has a firm basis for believing that a compelling State interest exists for certified business enterprises * * * that are owned and controlled by members of * * * minority groups * * * or by women, to be presumptively eligible for use by contractors to show required good faith efforts to meet participation goals.” (NY Reg, Sept. 9, 1992, at 105.) Accordingly, the good-faith effort requirements were again effective.
*65 Petitioner asserts that OMWBD’s publication of the Croson findings prior to distribution of HHC’s bid documents clearly evidences that the good-faith effort requirements applied to this contract. Furthermore, petitioner argues that the bid documents for the HVAC contract mandated compliance with the MBE/WBE program (unless a contractor elected to comply with the LBE program) and even contained percentage goals for the participation of MBEs and WBEs. Thus, petitioner asserts that since Roy Kay did not elect to comply with the LBE program, it was required to comply with the MBE/WBE program in the alternative and its failure to do so, or to evidence a good-faith effort to comply, renders its bid nonresponsive.
Petitioner’s arguments are fatally flawed for several reasons. First, as above noted the regulations require that each agency must first submit an agency goal plan to OMWBD specifying the percentage of participation of MBEs and WBEs anticipated in contracts to be awarded. In addition, agencies are also to establish and submit participation goals for each individual contract. Because the good-faith effort requirement was suspended for the whole of 1992, HHC could not have submitted a binding goal plan for 1992 contracts. Despite the fact that the bid documents distributed by HHC referred to MBE/WBE participation in accordance with article 15-A, and contained goals set by HHC for MBE/WBE participation, such participation was not mandatory at this time.
Second, although publication of the study served to revitalize the good-faith effort requirements, the fact that there was no valid goal plan in effect for HHC when the bid documents were distributed served as a further barrier to the immediate enforcement of these requirements. Not until HHC submitted its agency goal plan, along with its individual contract goals, and those plans were approved by OMWBD, could the good-faith effort requirements for compliance with those goals be regulated and enforced. This conclusion is supported by the OMWBD study report which makes clear that an agency’s goal plan forms an integral part of the regulatory scheme in that the goal plan, like the regulations, must be "narrowly tailor[ed] * * * to the specific circumstances of its procurement activities and logically relate those goals to the discrimination affecting M/WBEs actually and potentially involved in that procurement activity.” In addition, OMWBD indicated that each agency’s goal plan would be evaluated consistent with Croson dictates, to determine whether it provides justifi *66 cation for the proposed goals in light of Croson dictates. This position is further buttressed by OMWBD’s own approval letter to HHC which states that "[I]n accordance with Section 543.2 of the regulations, the Study findings justify reinstatement of the provision requiring bidders to make good faith efforts to meet MBE and WBE goals on State contracts * * * Approval of your [agency goal] [p]lan allows your agency to enforce this provision, and to include it among the terms of bid solicitations, requests for proposals and other contract offerings.” Here, HHC submitted its agency goal plan on October 26, 1992, which plan was not approved by OMWBD until February 12, 1993. Thus, the first point in time the good-faith effort requirements could have been enforced by HHC was February 12, 1993. However, because the bid documents had been distributed prior to this approval, the plan could not apply to the HVAC contract.
Finally, petitioner argues that the language of the bid documents evidences that compliance with the WBE/MBE program was mandatory. While there is language in the bid documents which supports petitioner’s position, there is equally significant language merely encouraging contractors to utilize MBEs/WBEs and itidicating that participation was voluntary. Despite the ambiguous and misleading provisions in the bid documents, however, the result remains the same. The law was such that participation in the MBE/WBE program for the HVAC contract was not mandatory and Roy Kay was not required to comply with the good-faith effort requirements. In addition, compliance with the LBE program also was not mandatory since Roy Kay was not required to subcontract work, either by statute or by the terms of the HVAC contract. Therefore, petitioner’s arguments are without merit.
In view of the foregoing, the court need not address petitioner’s arguments with respect to Wenco, the second lowest bidder.
Accordingly, the petition to vacate the award and to enjoin its implementation is denied in its entirety, since the award of the contract by HHC to the party it determined to be the lowest responsible and responsive bidder was not arbitrary, capricious, irrational or unlawful. The petition is dismissed.

 The statute defines a locally based enterprise as a business which generally receives gross receipts averaging $500,000 or less, and either earns at least 25% of its gross receipts from work performed in economic development areas, or employs a workforce of which at least 25% are economically disadvantaged persons (Administrative Code § 6-108.1 [a] [6]).